IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | * | |
| | * | |
| and | * | |
| INEZ MORGAN | * | Case NO: AMD 02-2592 |
| Plaintiffs | * | |
| v. | * | |
| SKYLINE CORPORATION, | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Skyline Corporation, properly identified as Homete Corporation, Defendant, by ALLEN, KARPINSKI, BRYANT & KARP and KEVIN KARPINSKI, its attorneys, moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment, for the reasons set forth in the memorandum of law filed herewith.

                        ALLEN, KARPINSKI, BRYANT
                        & KARP

BY:          /s/         
       KEVIN KARPINSKI
       Suite 1540
       100 East Pratt Street
       Baltimore, Maryland 21202
       410-727-5000
       Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | * |
| and | * |
| INEZ MORGAN | * |
| Plaintiffs | *   Case NO: AMD 02-2592 |
| | * |
| v. | * |
| | * |
| SKYLINE CORPORATION, | * |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

Skyline Corporation, properly identified as Homete Corporation, Defendant, by ALLEN, KARPINSKI, BRYANT & KARP and KEVIN KARPINSKI, its attorneys, submits this memorandum of law in support of its motion for summary judgment.

**INTRODUCTION**

Plaintiffs in this case, State Farm Fire and Casualty ("State Farm") and Inez Morgan ("Morgan"), filed suit on or about May 20, 2002, regarding a fire which occurred on May 8, 2000 at the home of Ms. Morgan. The Complaint alleges that Skyline Corporation ("Skyline") manufactured, distributed, and sold the mobile home to Ms. Morgan in 1995. Complaint, ¶4. The Complaint further alleges that the fire which occurred at the mobile home on May 8, 2000 was caused by a defective circuit breaker in the mobile home, for which Skyline is allegedly

responsible. Complaint, ¶10. The Complaint contains five counts: Negligence (Count I); Breach of Express Warranty (Count II); Breach of Implied Warranty of Merchantability (Count III); Breach of Implied Warranty of Fitness for a Particular Purpose (Count IV); and Strict Liability in Tort (Count V). Defendant now moves for summary judgment in its favor on the basis of spoliation of evidence.

## STATEMENT OF FACTS

As the origin and cause of the fire are the decisive issues in this case, the outcome necessarily hinges upon expert testimony and the physical evidence pertaining to those issues. Plaintiffs in this case have hired two experts: Tom Pavis and Ken McLaughlin. The Defendant has hired Rexford Wilson as its expert witness.

Following the fire on May 8, 2000, State Farm insurance adjuster John Morris was assigned the claim. See, Deposition of John Morris, attached hereto as Exhibit 1, p. 9-10. Morris prepared a handwritten log regarding the claims, which is attached hereto as Exhibit 2.[1] Morris called Mrs. Morgan, the homeowner, and made an appointment to inspect the damaged home on May 9, 2000 at 11:30 a.m. Exhibit 1, p. 10-11. After visually inspecting the home and determining that it was a total loss, Morris called Tom Pavis of Trifactor Consultants to perform a "cause and origin"

---

[1] The handwritten log notes (Exhibit 2) are very difficult to read. At his deposition, Mr. Morris read his notes into the record. Therefore, citations are to Mr. Morris' deposition transcript rather than the log notes themselves.

analysis in order to determine the cause of the fire.[2]  Exhibit 1, p. 12-14.  Morris met Tom Pavis at the Morgan home the next day (May 10th) to perform an inspection of the property.  Exhibit 1, p. 15.  During his inspection, Pavis found a wire located in the roofing section, near the panel box, which he believed to be the source of the fire.  Exhibit 1, p. 16.  Pavis showed the wire to Morris and told him that he believed the wire had "arced," starting the fire.  Exhibit 1, p. 16-18.

     Pavis testified at his deposition that his methodology for determining the origin of a fire is to examine the burn patterns, including visual inspection (but not measurement) of the extensiveness of char.  See, Deposition of Tom Pavis, attached hereto as Exhibit 3, p. 134-35.  Pavis testified that it is his opinion that the only heat source in the suspected area of origin capable of causing this fire was the electrical wiring.  Exhibit 3, p. 151.  Pavis recommended that State Farm hire an engineer, Ken McLaughlin.  According to Pavis, McLaughlin was hired to inspect the furnace.  Exhibit 3, p. 143.  According to Morris, McLaughlin was hired to determine exactly what occurred with the wire that might have caused it to arc.[3]  Exhibit 1, p. 16-18.  Morris first spoke with McLaughlin on May 10, 2000.  Exhibit 1, p. 18-19.

     When Pavis first contacted McLaughlin, he told McLaughlin that there was an issue as to whether the HVAC system was involved in the fire.  See, Deposition of Ken McLaughlin, attached hereto as Exhibit 5, p. 45.  McLaughlin testified that Pavis had already been to the scene and had

---

[2] Mr. Pavis testified that he performs 90% of his work for insurance companies, and that one third of his cases are obtained from State Farm Insurance Company.  Exhibit 3, p. 40-41.

[3] Mr. McLaughlin is a mechanical, rather than an electrical, engineer.

3

determined that the area of origin was in a circuit panel or above a circuit panel and his question was whether the heating and air conditioning system played any role in the fire. Exhibit 5, p. 45-46. McLauglin met Pavis at the scene on May 12, 2000. Id. Pavis informed McLaughlin of his belief that the origin of the fire was in the upper level of the home, above the power panel. Exhibit 5, p. 48. Pavis showed McLaughlin the arcing damage, where the conductors passed through the top plate of the partition wall. Exhibit 5, p. 50.[4] McLaughlin used a circuit analyzer provided by Pavis to trace back the conductors for the heating system to determine which breaker each circuit was on. Exhibit 5, p. 50-51. McLaughlin did not test or observe any other mechanical device, because he was only asked to evaluate the HVAC system. Exhibit 5, p. 52-53. McLaughlin took photographs of the area between the circuit breaker panel and the electric furnace, and of the heating unit itself. Exhibit 5, p. 56. He also took down some of the data off the data plate on the furnace. Id. McLaughlin told Pavis that he believed that they needed to "recover the evidence." Exhibit 5, p. 57. However, they "needed to allow any other interested party a chance to see everything the way it was," so they stopped work for the day. Exhibit 5, p. 57.

Morris' log indicates that on May 15th some neighbors complained about odor emanating from the scene. Exhibit 1, p. 20. Morris called Tom Pavis to see if it was okay to clean up the site. Id. Pavis responded that it was "okay to clean, but no structure. Traced wire to service. Need to remove." Id. The same day, Morris contacted Skyline and spoke with Linda Philippsen,

---

[4] McLaughlin testified that he relied upon Pavis' determination as to the origin of fire in rendering his opinions in this case. Exhibit 5, p. 21.

incorrectly identified as Linda Phillips. Exhibit 1, p. 21. Ms. Philippsen indicated that Skyline would send its own engineer to inspect the property. Exhibit 1, p. 21.

Skyline sent Rexford Wilson to inspect the property on May 18, 2000. See, Deposition of Rexford Wilson, attached hereto as Exhibit 4, p. 22-23. Also present at the scene that day were Pavis and Ms. Morgan. Exhibit 4, p. 23-24. Wilson spoke with various neighbors who had witnessed the fire. Exhibit 4, p. 24-28. Wilson also spoke with Pavis, who stated his theory that the fire had begun in the ceiling due to an arcing wire. Exhibit 4, p. 28-29. The next day, Wilson returned to the home and inspected it, taking a number of photographs. Exhibit 4, p. 28-29.

Wilson's methodology for determining the cause or origin of a fire is the "shrinking box technique." Exhibit 4, p. 33-34. This technique requires examination of the fire damage to determine where the fire began. Exhibit 4, p. 34-35. The goal is to attempt to get the box as small as possible and then look at what's hot in that area that could have caused the fire. Exhibit 4, p. 35. In this case, Wilson narrowed the shrinking box down to a three foot by four foot portion of the deck in the northeast corner of the mobile home. Exhibit 4, p. 35-37. Wilson was able to determine the "box" or area of origin of the fire by observing where the damage to the wooden debris of the mobile home and deck was most severe. Exhibit 4, p. 37-38. One of the factors used to determine where the damage is most severe is by measuring char depth, as compared to the original dimension of the material. Exhibit 4, p. 38. Any material that is completely consumed by fire provides an outside perimeter. Exhibit 4, p. 38-39. The char depth is used, in turn, to estimate "burn time." Id. In this case, based upon char depth measurements and other factors,

Wilson was able to determine that the burn time for the roof of the home was about 20 minutes, while the burn time for the portion of the deck where he believes the fire began was approximately 80 minutes. Exhibit 4, p. 38-39. Based upon the severity of the damage to the northeast corner of the home, Wilson concluded that the fire must have started there, on the deck where the trash cans had been stored. Exhibit 4, p. 39-40. The homeowner, Ms. Morgan, had told Wilson that she was a smoker, that she stored her trash cans on the deck, and that she smelled an odor like "burning hair" on the night before the fire and the morning of the fire before she left for work. Exhibit 4, p. 42-43. Based upon this information and the char depth of the wood at the northeast corner of the home on the deck, Wilson concluded that something smoldered in the "shrinking box" area for a period of time before the fire actually broke out. Exhibit 4, p. 44-48. Wilson is not able to state the exact cause of the fire (i.e., what actually smoldered or ignited). Exhibit 4, p. 44-48.

Because of the crucial nature of the char depth to Wilson's opinions, Wilson asked both Morris and Pavis to retain and preserve the area of the northeast corner or deck where Wilson believes the fire started (i.e., the "shrinking box"). Exhibit 4, p. 87-88. Wilson required the physical evidence of the deck area in order to be able to convey to a jury the depth of the char damage in the "shrinking box" area. Exhibit 4, p. 87-88. Both Morris and Pavis directly refused to preserve the evidence. Exhibit 4, p. 88.

At his deposition, Morris denied that Wilson ever asked him to preserve the portion of the deck where Wilson believes that the fire started. Exhibit 1, p. 27-28. Pavis, however, testified that

Wilson requested that the portion of the deck be preserved. Exhibit 3, p. 121. Pavis testified that he told Wilson that "if he wanted to preserve it he could go ahead and preserve it, that we weren't going to preserve it because it didn't play a role in the actual area of origin in our minds, so if he wanted to preserve it he could have done that." Exhibit 3, p. 122.

On May 23, 2000, Pavis and McLaughlin returned to the scene and removed the furnace, the circuit breaker panel and the conductors between the furnace and the circuit breaker panel. Exhibit 5, p. 59. They did not believe that the furnace had malfunctioned in any manner, but removed it "simply to preserve the evidence in case there was a question whether it did or not [play a role in the fire]." Exhibit 5, p. 59. The items were removed from the home by unscrewing the panel, cutting the framing out in order to get to the conductors, and then cutting off the furnace. Exhibit 5, p. 61-62. McLaughlin took possession of the items they removed from the scene and placed them in his truck. Exhibit 5, p. 60. Once the items were removed to McLaughlin's testing facility in Annapolis, he performed a test on the furnace to determine whether the fan was operating properly. Exhibit 5, p. 61. McLaughlin then placed the items in his storage trailer in Baltimore County. Exhibit 5, p. 61.

McLaughlin testified that, on May 23 when they removed the items from the scene, Pavis told him that Wilson had come out to the scene and inspected it. Exhibit 5, p. 62. McLaughlin provided the following testimony when asked whether he was aware that Wilson had requested that a portion of the deck be preserved:

Q:   And did you have a discussion with Mr. Pavis that someone from Skyline

|   |   |
|---|---|
| | had come out to look at the property? |
| A: | Yes. Yes, he did mention that. |
| Q: | And what do you recall of Mr. Pavis telling you about that? |
| A: | He said that the representative from Skyline disagreed as far as the areas of origin of the fire. |
| Q: | Did Mr. Pavis tell you where the representative of Skyline thought the fire originated? |
| A: | Yes. He - -as I recall, he mentioned that he believed the fire started outside the house on the - - an area of the front porch. |
| Q: | Near the northeast corner of the property? |
| A: | Yes. |
| Q: | And when you were told that did you undertake any steps to evaluate whether there could have been - - that could have been the origin or whether anything in that area could have been the cause of the fire? |
| A: | No. |
| Q: | Why not? |
| A: | Mr. Pavis was adamant that that was not correct, and I had no reason to disagree with him since he is a expert in area of origin determination. |
| Q: | So, he says. But your answer is you didn't do anything? |
| A: | That's correct. |
| Q: | And did you see Mr. Pavis take any steps to evaluate whether the northeast corner was the origin of the fire? |
| A: | I don't recall anything that he did. I really wasn't, you know, trying to determine what he was doing in that regard, but I don't have any recollection of that. |
| Q: | Did Mr. Pavis mention to you that Skyline had requested that a portion of the northeast corner be preserved? |
| A: | No. |
| Q: | Was there any discussion with Mr. Pavis as to other items that should be preserved while you were out there on May 23rd, securing the furnace, circuit breaker, and the conductors? |
| A: | No. |

Exhibit 5, p. 62-64. Thus, knowing that Wilson disagreed with his opinion regarding the origin of the fire, and knowing further that Wilson had requested that the portion of the deck be preserved, Pavis nevertheless removed what he needed and failed even to mention Wilson's

8

request to McLaughlin.

Morris' log notes indicate that he spoke to Tom Pavis again on May 25, 2000. Exhibit 1, p. 30-31. The notes state: "**Spoke to Tom Pavis at Trifactor. They have removed electrical items they need. Can go ahead with demo.** BG&E is scheduled to remove their equipment, 5-31." Exhibit 1, p. 30-31 (emphasis added). The home was demolished and the evidence which Wilson requested be preserved was destroyed.

**ARGUMENT**

**I.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE BASIS OF SPOLIATION OF EVIDENCE.**

The spoliation doctrine is a rule of evidence, administered at the discretion of the trial court to respond to circumstances in which a party fails to present, loses, or destroys evidence. <u>Vodusek v. Bayliner Marine Corp.</u>, 71 F.3d 148, 156 (4th Cir. 1995). The spoliation doctrine authorizes a court to order dismissal, to grant summary judgment, or to permit an adverse inference to be drawn against the party as a means to "level the evidentiary playing field and for the purpose of sanctioning improper conduct." <u>Id.</u>, 73 F.3d at 156.

The application of the rule must take into account whether the destroying party has notice of the evidence's relevance, the blameworthiness of the destroying party, and the prejudice suffered by the opposing party. <u>Ellicott Machine Corp. Int'l v. Jesco Constr. Corp.</u>, 199 F. Supp. 2d 290, 293 (D. Md. 2002); <u>Anderson v. Nat'l R.R. Passenger Corp.</u>, 866 F. Supp. 937, 945 (E.D. Va. 1994), <u>aff'd</u>, 74 F.3d 1230 (4th Cir. 1996). The sanction of summary judgment is warranted where

9

the destroying party did so intentionally and in bad faith. Hartford Ins. Co. v. Am. Auto. Sprinkler Sys., Inc., 201 F.3d 538, 544 (4th Cir. 2000); Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998). The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation. Silvestri v. Gen. Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001).

In this case, State Farm insurance company owned and controlled the evidence, i.e., the insured's home. State Farm and its agents and/or experts were on notice of the highly relevant nature of the evidence, which Wilson directly requested them to preserve. Pavis testified that he inspected the home two days after the fire and that he determined that faulty electrical wiring caused the fire. He (and State Farm) were thus fully aware of the anticipated lawsuit against Skyline. Pavis recommended that State Farm hire McLaughlin to exclude the furnace as a possible cause of the fire, also in anticipation of litigation.

There is no dispute that all three experts in this case had the opportunity to inspect the home and to take photographs. However, the physical evidence itself is recognized by all three experts as crucial to a determination of the origin of the fire. See, Plaintiff State Farm's Answers to Interrogatories, Answer No. 3, attached hereto as Exhibit 6 (stating State Farm's intention to "rely on physical items, such as the furnace, attached electrical wires to and from the furnace and/or to or from the breaker box."). Thus, Pavis and McLaughlin removed the electrical wires which Pavis believes arced and caused the fire. Though Wilson specifically requested that Pavis

preserve the wood portion of the deck where he believed the fire started, Pavis simply refused and failed to do so. Pavis' explanation that Wilson could preserve it himself is meritless because State Farm was in control of the evidence and it was therefore its duty to preserve it. See Silvestri, 271 F.3d at 590-91. On May 23, 2000, Pavis and McLaughlin went to the home and removed and preserved the items which Pavis relies on to support his origin theory, but blatantly failed to also preserve the wood portion of the deck which Wilson had explicitly requested be preserved.

State Farm's blameworthiness and bad faith, through Pavis, is evidenced by Pavis' behavior in removing the evidence favorable to State Farm, but not the evidence that was unfavorable to State Farm, despite Wilson's direct request that it be preserved. Pavis intentionally failed to preserve the evidence despite his knowledge of the crucial importance of that evidence to Wilson's opinions, with which he disagreed. Pavis was "adamant" that Wilson's conclusion regarding the origin of the fire was not correct. Exhibit 5, p. 64; Exhibit 3, p. 118. On May 23, 2000, when Pavis and McLaughlin went to the home to remove the evidence favorable to Pavis' theory, Pavis failed to even mention to McLaughlin that Wilson had requested the portion of the deck to be preserved. Exhibit 5, p. 62-64. Moreover, Pavis was regularly engaged by State Farm, receiving a third of his business from it. Exhibit 3, p. 40-41.

The uncontradicted facts thus demonstrate that Pavis was well aware of the crucial nature of the three by three wood portion of the northeast deck, that he was directly asked to preserve the evidence, and that he nevertheless refused and failed to preserve it. However, Pavis made sure to preserve the evidence supporting his theory and which he believed was favorable to State

Farm's position. Pavis' conduct was intentional and in bad faith.

In addition, Skyline has suffered extreme prejudice due to the intentional conduct and bad faith of Pavis/State Farm. While Wilson was able to inspect and take photographs of the fire damage, he intended to utilize the actual wood from the deck of the home to demonstrate to the jury the depth of the char measurements, and to show the jury why that portion of the deck must have been where the fire originated. Plaintiffs' experts in this case inspected the home and they took photographs. However, recognizing the importance of the actual physical evidence, they preserved the furnace, circuit breakers, and wires which allegedly support Pavis' theory regarding the origin of the fire. But Pavis intentionally and in bad faith refused and failed to preserve the actual physical evidence supportive of Wilsons' theory and necessary for him to adequately explain to the jury his theory regarding the origin of the fire. In essence, therefore, Wilson and Skyline have been stripped of their ability to adequately present their defense to the jury in a meaningful and effective manner.

Summary judgment for this deliberate and premeditated failure to preserve evidence, resulting in significant prejudice to Homete, is not unduly harsh. The policy underlying the Court's inherent power to sanction is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth. Silvestri v. Gen. Motors Corp., 271 F.3d at 590. In Silvestri, the Court stated that:

> '[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions - - all directed with unwavering effort to what, in good faith,

> is believed to be true on matters material to the disposition.' *Shaffer Equipment*, 11 F.3d at 457. The courts must protect the integrity of the judicial process because, '[a]s soon as the process falters . . . the people are then justified in abandoning support for the system.' *Id.*

Id., 271 F.3d at 590.

The integrity of the judicial system is threatened, in a case such as this, where a representative of an insurer, despite the adversary party's direct request, may simply refuse and fail to preserve evidence which he is well aware is crucial to a determination of liability. The factors the Court delineated in Silvestri for justification of the sanction of dismissal or summary judgment are (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim. Id., 271 F.3d 583. Both factors are present in this case. While in some cases (such as Silvestri) it is unclear whether the spoliator's conduct was negligent or intentional, in this case Pavis' conduct was clearly deliberate. See White v. Office of the Public Defender, 170 F.R.D. 138 (D. Md. 1997)(dismissing the plaintiff's complaint after she willfully destroyed evidence known to be relevant during discovery). Moreover, the prejudice suffered by Skyline is grave. Without the destroyed section of the deck to show the jury at trial, Wilson will not be able to physically demonstrate to the jury the char depth, as compared to the dimensions of a normal piece of wood and, thus, will not be able to demonstrate his theory regrading the origin of the fire. See Silvestri, 271 F.3d at 594 ("To require General motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result

13

in irreparable prejudice."). The origin of the fire is the dispositive issue in this case. State Farm's representatives, despite a direct request to preserve it, and knowing full well the crucial nature of the evidence, nevertheless intentionally destroyed it. The clear inference is that Pavis did so because he knew the evidence disproved his theory and because it disfavored State Farm's position. Pavis' conduct amounts to willful destruction of evidence, in bad faith, and is appropriately sanctionable by this Court with the remedy of summary judgment in Defendant's favor.

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted in favor of Defendant.

                                  Respectfully submitted,

                                  ALLEN, KARPINSKI, BRYANT
                                  & KARP

BY:         /s/
                KEVIN KARPINKSI
                100 East Pratt Street
                Suite 1540
                Baltimore, Maryland 21046
                410-727-5000
                Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of September, 2003, a copy of Defendant's Motion for Summary Judgment and Memorandum in Support thereof were electronically filed with notice to:

Lawrence E. Ballantine, Esquire
1 West Pennsylvania Avenue
Suite 500
Towson, Maryland 21204-5025

                                                /s/
                                  Of Counsel for Defendant