```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2


 3   STATE FARM FIRE & CASUALTY
     COMPANY, et al.
 4
                    Plaintiffs
 5                                          NO. AMD 02 CV 2592

 6   vs.

 7   SKYLINE CORPORATION

 8                    Defendant

 9   _____/

10             The deposition of THOMAS J. PAVIS, JR.

11   was held on Tuesday, March 4, 2003, commencing at

12   10:00 A.M. at the law offices of H. Barritt Peterson,

13   Jr. & Associates, One West Pennsylvania Avenue, Suite

14   500, Towson, Maryland 21204, before Sandra A. Slater,

15   Notary Public.

16   APPEARANCES:

17            LAWRENCE E. BALLANTINE, ESQUIRE
                 On behalf of Plaintiffs
18
              KEVIN KARPINSKI, ESQUIRE
19               On behalf of Defendant

20

21   REPORTED BY:  Sandra A. Slater, RPR, CSR
```

```
 1         A     State Farm, Allstate, Nationwide,
 2   Encompass.
 3         Q     Encompass, is that formerly CNA?
 4         A     Yes, correct.
 5         Q     Okay.
 6         A     Safeco, Zurich, Farmers, Erie, Beacon,
 7   Hartford Mutual, the Hartford with a T, MAIF, that's
 8   Automobile Insurance Fund, Maryland Automobile
 9   Insurance Fund, Ohio Casualty.  I'm really testing the
10   memory now.
11         Q     Anyone else?
12         A     There is probably a few that I probably
13   haven't mentioned but that's basically the gist of
14   them.
15         Q     And as a percentage of your overall
16   business how much of it is generated through insurance
17   companies?
18         A     Easily 90 percent.
19         Q     Okay.  And the other ten percent
20   represents what?
21         A     Represents independent adjusters like
```

```
 1   Leisure Associates, Crawford & Company, Hagan &
 2   Associates, those types of organizations.
 3        Q    Who are oftentimes adjusting claims for
 4   other insurance companies?
 5        A    Exactly, exactly.  And then also we get an
 6   occasional case from a law firm.  Again, sometimes,
 7   most of the times they are representing a carrier but
 8   we get calls from White & Williams, we get calls from
 9   Kozen & Connor, and a couple other law firms that I
10   can't remember off the top of my head.  And then we do
11   also an occasional case for individuals who have had a
12   fire and either they don't have insurance and want to
13   know the cause of the fire or they have an insurance
14   carrier but they want their own expert to go out.
15        Q    And as a percentage of your overall
16   business how much of it is generated through State
17   Farm Insurance?
18        A    About, I would say about maybe a third of
19   the cases, maybe a fourth.
20             MR. KARPINSKI:  Mark that as Two.
21             (Pavis Deposition Exhibit Number Two was
```

```
 1   I don't want to miss anything. The direction and
 2   travel of the fire from the area of origin. The only
 3   structural or mechanical heat source located within
 4   the area of origin was, in fact, the electrical
 5   wiring.
 6        Q    Well, of course, that assumes that that is
 7   the area of origin.
 8        A    Well, that's the way --
 9        Q    The heat source.
10        A    Well, that was my expert opinion. And the
11   fact that we have an eye-witness account that
12   corroborates my finding that the fire originated where
13   I say it did and not on the surface of the deck and,
14   of course, my observations as to the deck itself, and
15   considering the deck as it being the possible area of
16   origin. I didn't find any evidence that would suggest
17   to me that the fire originated on the exterior of the
18   deck.
19        Q    No evidence at all?
20        A    No evidence at all.
21        Q    So the missing wood was not evidence to
```

1   Q   Sure.

2   A   -- my visual inspection of char, no.

3   Q   Do you recall telling the person who went
4   out for Skyline that you believe char reading is a
5   lost art?

6   A   No.

7   Q   Do you recall anything about your
8   conversations with the gentleman from Skyline?

9   A   I wanted to know if he was interested in
10  looking in the area where we felt that the fire
11  started and he wasn't interested in doing that.

12  Q   Okay.  You are saying he did not look in
13  the area where you believe the fire originated?

14  A   No, we offered him a ladder in order to
15  get up and take a look at this area and he chose not
16  to do that.

17  Q   Do you recall the individual from Skyline
18  asking that a certain portion of the deck be
19  preserved?

20  A   Yes, I do.

21  Q   Okay.  And was that preserved?

1  A   It wasn't preserved by us, no.

2  Q   Why wasn't it preserved?

3  A   I told him if he wanted to preserve it he could go ahead and preserve it, that we weren't going to preserve it because it didn't play a role in the actual area of origin in our minds, so if he wanted to preserve it he could have done that.

8  Q   So in your mind the individual represented from Skyline was supposed to begin cutting out a portion of the deck of one of State Farm's insureds? That would have been appropriate?

12 A   It would have been appropriate for him if he wanted to preserve the evidence, it would have been appropriate for him to do that.  He certainly had our permission to go ahead and do that.

16 Q   And when you say our permission, whose permission is that?

18 A   Permission of myself and State Farm.

19 Q   Let's go back to your report.  Have we talked about your visit on the 10th?

21 A   Yes.

1  organization?

2     A    No.

3     Q    I take it you are not a member of such an
4  organization?

5     A    No.

6          MR. BALLANTINE:  Society of Fire
7  Protection Engineers?

8          MR. KARPINSKI:  Yes.

9     Q    Do you recall anything else from your
10 conversations with Mr. Wilson?

11    A    No, I had to help him load his camera up
12 but --

13    Q    Oh, he had trouble loading his camera?

14    A    Well, he only has one arm so I helped him
15 out there and I offered him any assistance that we
16 could give him so that he could do his investigation.

17    Q    Had you told him that you were going to
18 bring some tools with you?

19    A    I had a whole truck full of tools.

20    Q    You had your truck with you?

21    A    Yes.

1    Q    Your truck didn't break down on the way
2 there?
3    A    My truck?
4    Q    Yes.
5    A    No.
6    Q    Your report says that fire evidence in the
7 form of burn patterns revealed that the fire had
8 originated within the interior of the ceiling.
9 Describe for me as fully and completely as you can
10 what the burn patterns were and what is the
11 significance of burn patterns.
12   A    Well, the burn patterns were actually the
13 absence of any wood structure, any joists, any ceiling
14 support structure, any of the interior roof.  The burn
15 patterns showed that, again, burn patterns in the form
16 of extensive char, moving away from the area of origin
17 to the hallway and to the other rooms that were -- the
18 aforementioned rooms that are in the report indicate
19 that the damage to these structural areas of the roof
20 were less as you walked away, as you went away from
21 the area of origin.

```
 1        Q    In that area?
 2        A    Um-hum.
 3        Q    It looks like it said due to the nature of
 4   this fire, mechanical engineer Ken McLauchlan was
 5   asked to assist.  Why did you need his assistance?
 6        A    Because I wanted to have the furnace
 7   examined.  As well as the other mechanical.
 8        Q    And you called Mr. McLauchlan to arrange
 9   that?
10        A    Well, first I asked permission of the
11   insurance carrier, then I called him.
12        Q    Your report goes on to say the fire had
13   been discovered by neighbors.  Is that Kathy
14   Llewellyn?
15        A    Yes, sir.
16        Q    What is the significance of the fact that
17   the circuit breaker, quote, would trip frequently, end
18   quote?
19        A    My impression of that was that there may
20   have been some sort of a failure developing.
21        Q    And why is that?
```

1   Q   How about the cause? What's the basis for
2   your opinion that the cause of the fire was arcing of
3   wires near the circuit breaker?
4   A   Very simply that the only heat source
5   located within the area of origin, my area of origin,
6   that was capable of causing the type of damage that we
7   have documented in our photographs would be the
8   electrical wiring, and then when you examine that
9   electrical wiring you find that one of the conductors
10  or one line of the conductors that would have fed the
11  circuit breaker panel box for the furnace was, in
12  fact, arced. And then you add in the other things,
13  that she smelled something unusual, the fact that that
14  breaker would frequently trip, the eye-witness account
15  of Ms. Llewellyn that corroborated our initial
16  findings, all that goes into the formulation of that
17  opinion.
18  Q   Was Ms. Morgan a smoker?
19  A   I believe she was.
20  Q   Did you ask her any questions about where
21  she smoked and how often she smoked, whether she

```
 1   State of Maryland

 2   City of Baltimore, to wit:

 3              I, Sandra A. Slater, a Notary Public of

 4   the State of Maryland, County of Harford, do hereby

 5   certify that the within-named witness personally

 6   appeared before me at the time and place herein set

 7   out, and after having been duly sworn by me, according

 8   to law, was examined by counsel.

 9              I further certify that the examination was

10   recorded stenographically by me and this transcript is

11   a true record of the proceedings.

12              I further certify that I am not of counsel

13   to any of the parties, nor in any way interested in

14   the outcome of this action.

15              As witness my hand and notarial seal this

16   10th day of March, 2003.

17                        _____
                              Sandra A. Slater
18                              Notary Public

19

20   My Commission Expires:

21   April 5, 2005
```